UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------ x

CHRISTINE MCGRATH KAMRASS,                :
                                          :
                         Plaintiff,       :
                                          :
            -against-                     :
                                          :
JEFFERIES LLC, et al.,                    :
                                          :
                         Defendants.      :

------------------------------------ x

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: NOV 1 9 2020

MEMORANDUM DECISION
AND ORDER

17 Civ. 7465 (GBD)

GEORGE B. DANIELS, United States District Judge:

Plaintiff Christine McGrath Kamrass brings this employment discrimination action against

Defendants Jefferies, LLC, Jefferies & Company Inc., Jefferies Investments, LLC,[1] and John Laub,

alleging violations of the Ohio Fair Employment Act, Ohio R.C. 4112.01 *et seq.* (the "Ohio Act"),

Ohio public policy through wrongful discipline, Title VII of the Civil Rights Act of 1964, and the

Age Discrimination in Employment Act of 1967 ("ADEA"). Plaintiff principally claims that from

the time Defendant Laub was hired, Defendants discriminated against her on the basis of her age

and sex by (1) restricting her opportunities to develop business, (2) hiring a younger, male

employee to cover the same region as her, and (3) unfairly compensating her. Defendants move

for summary judgment pursuant to Federal Rule of Civil Procedure 56, seeking dismissal of all of

Plaintiff's claims. (Notice of Mot. for Summ. J, ECF No. 90.) Defendants' motion for summary

judgment is GRANTED to the extent that Plaintiff's Ohio public policy claim, Ohio Act age

discrimination claims, ADEA claims, and retaliation claims are dismissed.

---

[1] Defendants Jefferies, LLC, Jefferies & Company Inc., and Jefferies Investments, LLC are referred to,
interchangeably, as "Jefferies" throughout this opinion.

## I.   FACTUAL BACKGROUND

Jefferies is a global investment banking firm headquartered in New York that provides institutional clients with capital markets, research, and financial advisory and execution services. (Pl.'s Resp. to Defs.' Local Rule 56.1 Statement of Material Facts and Statement of Additional Material Facts Pursuant to Local Civil Rule 56.1 ("Pl.'s Rule 56.1 Counterstatement"), ECF No. 99, ¶ 1.)   Salespeople in Jefferies' Prime Brokerage unit are responsible for sourcing and introducing institutional clients and hedge funds to Jefferies' Prime Brokerage platform and maintaining those client relationships once they are onboarded at Jefferies. (*Id.* ¶ 12.)   Plaintiff has worked in Jefferies' Prime Brokerage Sales unit as a Senior Vice President since 2006. (*Id.* ¶ 13.) She was hired at the age of 39 by Defendant Laub's predecessor, who was then Head of Prime Brokerage Services. (*Id.* ¶¶ 13, 16.)   Plaintiff alleges that she began experiencing discrimination when Laub joined Jefferies in July 2014.   Her allegations can be divided into three categories of purportedly adverse employment actions.

### A.  Denial of Business Opportunities

Plaintiff claims that she was excluded from sales and marketing opportunities.[2]   Indeed, Plaintiff was not permitted to attend or had to justify her presence at multiple client, professional development, or networking events. (Defs.' Resp. to Pl.'s Statement of Additional Material Facts Pursuant to Local Civil Rule 56.1 ("Defs.' Rule 56.1 Counterstatement"), ECF No. 101, ¶¶ 166–169.)   On at least one occasion, Plaintiff was not permitted to attend a conference in Florida that all of her male colleagues attended. (*Id.* ¶ 168.)   On another occasion, Plaintiff was asked to justify

---

[2] Plaintiff further testified in deposition that Laub would routinely fail to call on Plaintiff during weekly sales calls or acknowledge her successes. (*Id.* ¶ 172.)   Her male colleagues would reach out to her after such calls to joke about Laub's disregard for her. (*Id.*)   Plaintiff also testified that Laub would publicly reprimand her for minor issues for which her male colleagues were not similarly critiqued. (*Id.* ¶ 173.)

her presence at an industry conference, but contends that her male colleagues were all included without additional inquiry.[3] (*Id.* ¶ 169.) Plaintiff claims that attending such events is critical to business development. (*Id.* ¶ 170.) Defendants concede that Plaintiff did not attend certain conferences. However, they dispute whether Plaintiff was subject to disparate treatment and maintain that Plaintiff's exclusion from any such events was not inappropriate. (*Id.* ¶¶ 166–169.)

Plaintiff also claims that her geographic market was limited and requests to expand her territory were denied. Plaintiff was hired, in part, to provide coverage for the Midwest, but under Laub's predecessor, she was permitted to pursue business opportunities in any geographic territory she chose. (Pl.'s Rule 56.1 Counterstatement ¶¶ 14, 17.) In contrast, under Laub, Plaintiff was to focus on the Midwest. (*Id.* ¶ 41.) Plaintiff made repeated requests to expand her territory, including following her 2016 annual review. (Defs.' Rule 56.1 Counterstatement ¶ 177.) In response, Plaintiff was asked to justify her request. (*Id.*) Plaintiff testified that her male colleagues were not subject to any such requirement, though Defendants dispute this claim. (*Id.*) Plaintiff also asked to cover Texas, after her colleague who had covered that state resigned. (*Id.* ¶ 178.) Laub, however, rejected her request. (*Id.*)

### B. Jefferies' Hiring of Craig Cohen

Plaintiff claims that Defendants' efforts to restrict her opportunities to develop business were furthered by Jefferies' hiring of Craig Cohen as a Senior Vice President in the Prime Brokerage Sales unit in late 2016. Laub communicated to Plaintiff and others that Cohen, age 39, was hired to cover the Southwest, Midwest, and Texas. (*Id.* ¶¶ 194, 200; Pl.'s Rule 56.1 Counterstatement ¶¶ 70, 111.) Plaintiff claims that Cohen was hired as her future replacement. Defendants do not dispute that around this time, Defendants were contemplating firing Plaintiff.

---

[3] Plaintiff did, ultimately, attend this conference. (*Id.* ¶ 169.)

(Defs.' Rule 56.1 Counterstatement ¶ 189.)  Moreover, in deposition testimony, Laub conceded that the Midwest did not require two full-time salespeople and admitted that Cohen could have been a replacement for Plaintiff in the future.  (*Id.* ¶ 206.)  According to Laub, however, Cohen was hired because of an opening in Texas, which had been covered by a salesperson who resigned in September 2016.  (*Id.*; Pl.'s Rule 56.1 Counterstatement ¶ 70.)  Defendants also hoped that Cohen would increase sales in the Midwest.  (Defs.' Rule 56.1 Counterstatement ¶¶ 196, 206.)  Other internal communication between senior management, however, indicated that Cohen would be "an upgrade/replace for current Midwest coverage."  (*Id.* ¶ 203.)

Dual coverage of the Midwest by Cohen and Plaintiff did not proceed cooperatively, as Plaintiff and Cohen had multiple disputes over clients or prospects in the region.  (Pl.'s Rule 56.1 Counterstatement ¶¶ 72, 75.)  In resolving disputes over prospective clients, Jefferies sometimes directed leads to Cohen and, at other times, decided in Plaintiff's favor.  (*Id.* ¶ 77; Defs.' Rule 56.1 Counterstatement ¶ 221.)   Plaintiff, however, contends that the division of prospects was unbalanced and there was a consistent pattern of Jefferies directing such leads to Cohen instead of Plaintiff.  (Pl.'s Rule 56.1 Counterstatement ¶ 77.)  Cohen also actively solicited a number of Plaintiff's clients, including her most lucrative client, and attempted to wrest control of those relationships from Plaintiff.  (Defs.' Rule 56.1 Counterstatement ¶¶ 223–225, 227–233.)  Despite Cohen's efforts, however, Plaintiff does not identify any instance of Defendants transitioning an existing client from Plaintiff to Cohen.

Plaintiff alleges that Cohen was never disciplined for these actions.  (*Id.* ¶ 236.)  Defendants admit that Cohen was not formally disciplined, but Plaintiff's immediate supervisor, Barsam Lakani, indicated that he had corrected Cohen on certain occasions.  (*Id.*)  Moreover, to address the ongoing conflict between Plaintiff and Cohen, in August 2017, Lakani issued regional

4

guidelines for Prime Brokerage salespeople. (Pl.'s Rule 56.1 Counterstatement ¶ 79.) Under the guidelines, each salesperson would cover a specific region or state and could approach a prospect outside of his or her region only for a compelling reason (e.g., an existing relationship or a personal connection with the prospect). (*Id.*) Lakani believed such guidelines would promote efficiency and enhance the client experience by reducing the possibility that multiple salespeople might be communicating with the same prospect. (*Id.* ¶ 80.) Under the guidelines, Plaintiff and Cohen continued to share the Midwest region. (*Id.* ¶ 82.) Plaintiff was also assigned Colorado (Denver), Georgia, and Florida, while Cohen was assigned Maryland, Delaware, Virginia, West Virginia, North Carolina, and South Carolina. (*Id.* ¶¶ 83–84.) Since then, Plaintiff has also started covering Pittsburgh, Pennsylvania. (*Id.* ¶ 87.)

A year later, in September 2018, Cohen voluntarily resigned from Jefferies for a number of reasons, including, *inter alia*, his relationship with Plaintiff, the fact that the Midwest market was too small for coverage by two salespeople, and his compensation, in particular the fact that he did not receive a year-end bonus in 2017. (*Id.* ¶ 98; Defs.' Rule 56.1 Counterstatement ¶ 257.) Further, Cohen believed that Jefferies gave Plaintiff significantly more business opportunities than were given to him. (Pl.'s Rule 56.1 Counterstatement ¶ 100.) Since Cohen's resignation, Plaintiff has independently covered the Midwest and continues to cover Colorado, Georgia, Florida, and Pittsburgh, Pennsylvania. (*Id.* ¶ 101.)

## C. Plaintiff's Performance and Compensation

Plaintiff contends that Defendants unfairly compensated her because of her age and gender. During Plaintiff's employment at Jefferies, her base salary has never been reduced and she has never been demoted. (*Id.* ¶¶ 122–123.) What has fluctuated is her annual discretionary bonus. Defendants argue that Plaintiff's bonuses were the appropriate result of several factors, including

her performance and geographical region.

Plaintiff had a history of positive performance reviews prior to Defendant Laub's hiring in 2014. In 2011, she received an annual performance rating of "above average." (Defs.' Rule 56.1 Counterstatement ¶ 135.) Plaintiff's year-end review was positive, as her supervisor remarked that she had "done a great job supporting the Midwest" and highlighted the revenue growth she had achieved. (*Id.* ¶ 134.) That year, Plaintiff received a salary of $300,000 and a discretionary bonus of $33,750. (Pl.'s Rule 56.1 Counterstatement ¶ 24.) In January 2012, Plaintiff and several other Prime Brokerage salespeople were considering leaving Jefferies. (*Id.* ¶ 22.) As an incentive to stay and keep the sales team together, Jefferies offered Plaintiff an employment agreement under which she received an increased base salary of $350,000, along with a $300,000 annual bonus for 2012 and 2013. (*Id.* ¶¶ 23, 25.) Plaintiff's bonuses for 2012 and 2013 were thus predetermined. (*Id.* ¶ 25.) In 2012, Plaintiff again received an annual performance rating of "above average." (*Id.* ¶ 28.) In 2013, her performance was rated "average." (*Id.* ¶ 29.) For both years, Plaintiff received her contractually guaranteed $300,000 annual bonus, but no discretionary bonus. Thereafter, Plaintiff's bonuses were again subject to Jefferies' discretion. (*Id.* ¶ 32.) Her performance reviews worsened. The following year, Plaintiff received a performance rating of "below average" and her supervisor described a number of areas for improvement, including, *inter alia*, revenue generated and number of accounts opened, overall understanding of basic policies and procedures, lack of attention to detail, and the need to be more proactive with her book of business.[4] (*Id.* ¶¶ 33–34.) Nevertheless, Plaintiff received a discretionary bonus of $50,000 in 2014. (*Id.* ¶ 37.)

In 2015, Laub became Plaintiff's direct supervisor. (*Id.* ¶ 40.) Plaintiff received a rating of "average" on her performance review for that year. (*Id.* ¶ 45.) Laub's evaluation was mixed,

---

[4] Plaintiff does not claim that her 2014 review or supervisor was discriminatory. (*Id.* ¶¶ 35–36.)

as he indicated that Plaintiff's year over year revenue growth rate was below all but one salesperson, but also highlighted her "nice success stories." (*Id.* ¶ 46.) Plaintiff received no discretionary bonus in 2015. (*Id.* ¶ 49.)

In May 2016, Barsam Lakani became Plaintiff's direct supervisor, though Laub was still head of Prime Brokerage Services. (*Id.* ¶ 57.) That year, Plaintiff received a "below average" rating on her performance review. (*Id.* ¶ 58.) In Plaintiff's evaluation, Lakani observed that Plaintiff "has made efforts regarding market share" and revenue, but noted several areas of improvement, including, *inter alia*, developing a robust pipeline of new prospects or clients, maximizing current client relationships, and pricing appropriately. (*Id.* ¶ 59.) Plaintiff, in her self-evaluation section of the performance review, identified 2016 as a "very bad year for the hedge fund community." (*Id.* ¶ 62.) Plaintiff's "below average" rating was her second within a three-year period, and she was the only Prime Brokerage salesperson to receive a rating of "below average" or worse on a performance evaluation since Laub joined Jefferies in 2014. (*Id.* ¶ 63.) Jefferies also conducted anonymous peer reviews in 2016. (*Id.* ¶ 91.) Plaintiff received the lowest rating among all evaluated Prime Brokerage Sales employees, though her rating reflected performance between "effective" and "above average effectiveness." (*Id.* ¶ 92.) Plaintiff received no discretionary bonus in 2016. (*Id.* ¶ 61.)

Jefferies stopped assigning ratings on performance evaluations after 2016. (*Id.* ¶ 63.) In Plaintiff's year-end evaluation for 2017, Lakani observed that Plaintiff had improved upon much of what they discussed the previous year and specifically noted that 2017 was "a better year" for "new business origination and revenue producing opportunities." (*Id.* ¶ 89.) He also indicated that Jefferies had yet to see much business out of two of the new regions that Plaintiff had been assigned in August—Florida and Georgia—and she should explore more opportunities

7

accordingly. (*Id.*) Plaintiff earned a bonus of $25,000 in 2017. (*Id.* ¶ 90.) Plaintiff's peer reviews in 2017 again reflected performance in the range of "effective" to "above average effectiveness," though she had the lowest score of all but one of her Prime Brokerage Sales colleagues. (*Id.* ¶ 92.)

In sum, Plaintiff's annual compensation and performance ratings for 2011–2017 were as follows:

| Year | Salary | Discretionary Bonus | Other Bonus | Performance Evaluation |
|------|--------|---------------------|-------------|------------------------|
| 2011 | $300,000 | $33,750 | N/A | Above Average |
| 2012 | $350,000 | $0 | $300,000 | Above Average |
| 2013 | $350,000 | $0 | $300,000 | Average |
| 2014 | $350,000 | $50,000 | N/A | Below Average |
| 2015 | $350,000 | $0 | N/A | Average |
| 2016 | $350,000 | $0 | N/A | Below Average |
| 2017 | $350,000 | $25,000 | N/A | N/A |

(*Id.* ¶¶ 23–24, 28–29, 32–33, 37, 45, 49, 58, 61, 90, 96; Defs.' Rule 56.1 Counterstatement ¶ 135.)

Plaintiff alleges that she was unfairly compensated in relation to her peers after Laub's hiring in 2014. That year, Plaintiff received the smallest discretionary bonus. (Pl.'s Rule 56.1 Counterstatement ¶ 111.) In 2015, excluding a terminated employee, Plaintiff was one of two salespeople to not receive a discretionary bonus. (*Id.* ¶ 113.) The other individual was terminated early in 2016. (*Id.* ¶¶ 113–115.) In 2016, Plaintiff was the only salesperson employed for the entire year who did not receive a discretionary bonus. (*Id.* ¶ 116.) Finally, in 2017, Plaintiff received the second lowest discretionary bonus among the Prime Brokerage salespeople who were

employed for the entire year and were eligible for a discretionary bonus.[5] (*Id.* ¶¶ 111, 117.) That year, Plaintiff generated more revenue than her two male colleagues who received larger discretionary bonuses. (*Id.* ¶ 111; Defs.' Rule 56.1 Counterstatement ¶¶ 247–254.)

## II.   LEGAL STANDARD

Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). "An issue of fact is 'genuine' if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Gayle v. Gonyea*, 313 F.3d 677, 682 (2d Cir. 2002) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A fact is material when it "might affect the outcome of the suit under the governing law." *Gayle*, 313 F.3d at 682 (quoting *Anderson*, 477 U.S. at 248).

The party seeking summary judgment has the burden of demonstrating that no genuine issue of material fact exists. *See Marvel Characters, Inc. v. Simon*, 310 F.3d 280, 286 (2d Cir. 2002). In turn, to defeat a motion for summary judgment, the opposing party must raise a genuine issue of material fact. *See Caldarola v. Calabrese*, 298 F.3d 156, 160 (2d Cir. 2002). To do so, it "must do more than simply show that there is some metaphysical doubt as to the material facts," *id.* (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)), and it "may not rely on conclusory allegations or unsubstantiated speculation," *Fujitsu Ltd. v. Fed. Express Corp.*, 247 F.3d 423, 428 (2d Cir. 2001) (quoting *Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir. 1998)). Rather, the opposing party must produce admissible evidence that supports its pleadings. *See First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 289–90 (1968). In this

---

[5] Cohen was employed for all of 2017 and did not receive a discretionary bonus. However, he received a large predetermined "signing bonus" that was considered internally to foreclose him from receiving a discretionary bonus. (Defs.' Rule 56.1 Counterstatement ¶ 205.)

regard, "[t]he 'mere existence of a scintilla of evidence' supporting the non-movant's case is also insufficient to defeat summary judgment." *Niagara Mohawk Power Corp. v. Jones Chem., Inc.*, 315 F.3d 171, 175 (2d Cir. 2003) (quoting *Anderson*, 477 U.S. at 252).

In determining whether a genuine issue of material fact exists, the court must construe the evidence in the light most favorable to the opposing party and draw all inferences in that party's favor. *See id.* However, "a court must not weigh the evidence, or assess the credibility of witnesses, or resolve issues of fact." *Victory v. Pataki*, 814 F.3d 47, 59 (2d Cir. 2016) (citation omitted). Summary judgment is therefore "improper if there is any evidence in the record that could reasonably support a jury's verdict for the non-moving party." *Marvel*, 310 F.3d at 286.

## III. PLAINTIFF HAS RAISED GENUINE ISSUES OF MATERIAL FACT AS TO HER TITLE VII AND OHIO ACT GENDER DISCRIMINATION CLAIMS

Title VII prohibits an employer from discriminating on the basis of race, color, religion, sex, or national origin. 42 U.S.C. § 2000e–2(a)(1). ADEA prohibits employment discrimination on the basis of age against persons aged 40 or older. 29 U.S.C. §§ 623(a)(1), 631(a). Discrimination claims under Title VII and ADEA are both analyzed pursuant to the burden shifting framework articulated by the Supreme Court in *McDonnell Douglas Corporation v. Green*, 411 U.S. 792 (1973).[6] *See D'Cunha v. Genovese/Eckerd Corp.*, 479 F.3d 193, 194–95 (2d Cir. 2007); *Ya-Chen Chen v. City Univ. of N.Y.*, 805 F.3d 59, 73–74 (2d Cir. 2015). Under this framework, the plaintiff bears the initial burden of establishing a prima facie case of discrimination. *McDonnell Douglas*, 411 U.S. at 802. If the plaintiff establishes a prima facie case of discrimination, the defendant may rebut that showing by providing a legitimate,

---

[6] The parties agree that case law interpreting Title VII and ADEA is generally applicable to cases involving violations of the Ohio Act. *See Plumbers & Steamfitters Joint Apprenticeship Comm. v. Ohio Civil Rights Comm'n*, 66 Ohio St. 2d 192, 196 (1981). Accordingly, except where otherwise noted, this Court's analysis of Plaintiff's federal claims applies equally to Plaintiff's Ohio Act claims.

nondiscriminatory reason for its actions. *Id.* At that point, any presumption of discrimination drops out of the analysis and the defendant is entitled to summary judgment unless the plaintiff, who bears the "final and ultimate burden," demonstrates that the defendant's proffered reasons are in fact a pretext. *Abrams v. Dep't of Pub. Safety*, 764 F.3d 244, 251 (2d Cir. 2014).

## A. Prima Facie Case of Discrimination

To state a prima facie case of employment discrimination under Title VII or ADEA, the plaintiff must demonstrate that (1) she was a member of a protected class (e.g., gender or persons who are at least 40 years of age), (2) she was qualified for the position she held, (3) she suffered an adverse employment action, and (4) such action occurred under circumstances giving rise to an inference of discriminatory intent. *Brown v. City of Syracuse*, 673 F.3d 141, 150 (2d Cir. 2012); *D'Cunha*, 479 F.3d at 195. "Although the burden at the initial stage of the *McDonnell Douglas* analysis is 'minimal,' [a plaintiff] must adduce some evidence to support . . . [her] prima facie discrimination claims to avoid summary judgment." *Jimenez v. Donahoe*, 968 F. Supp. 2d 609, 620 (S.D.N.Y. 2013) (quoting *Scoria v. Rubin*, 117 F.3d 652, 654 (2d Cir. 1997)). Here, only the third and fourth elements of Plaintiff's prima facie case—adverse employment action and an inference of discriminatory intent—are in dispute.

### 1. Adverse Employment Action

An adverse employment action is a "materially adverse change in the terms and conditions of employment." *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 85 (2d Cir. 2015) (quoting *Galabya v. N.Y.C. Bd. of Educ.*, 202 F.3d 636, 640 (2d Cir. 2000)). To meet this standard, an action must be "more disruptive than a mere inconvenience or an alteration of job responsibilities." *Id.* (quoting *Terry v. Ashcroft*, 336 F.3d 128, 138 (2d Cir. 2003)). Examples include "termination of employment, a demotion evidenced by a decrease in wage or salary, a less

11

distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices unique to a particular situation." *Id.*

Plaintiff's allegations that Laub would not call on her during weekly sales calls or acknowledge her successes and would reprimand her for minor issues do not rise to the level of adverse employment actions. Nor does Defendants' decision to hire Cohen. Though Defendants may have contemplated firing Plaintiff, she was not terminated or demoted after Cohen's hire. She did not "assume[] a less distinguished title" or "suffer[] material loss of benefits." *Savarese v. William Penn Life Ins. Co. of New York*, 418 F. Supp. 2d 158, 162 (E.D.N.Y. 2006). Plaintiff covered the same territory before and after the Cohen hire and there is no evidence that any of her existing clients were transitioned to Cohen. Cohen's unsuccessful efforts to assume control of Plaintiff's client relationships cannot be imputed to Defendants.

After Cohen's hire, Plaintiff certainly faced competition for prospects in the Midwest region, but Plaintiff concedes that such leads were sometimes given to her and sometimes assigned to Cohen. Her belief, without more, that such assignments unfairly benefitted Cohen is insufficient to sustain an adverse employment action. Other than a few prospective clients that Plaintiff asserts she had been working to secure before they were assigned to Cohen, Plaintiff provides no evidence that Defendants favored Cohen in dividing up prospects.[7] Moreover, Cohen testified that he believed it was Plaintiff who received a disproportionate amount of client leads. To be sure, Defendants' placement of another salesperson in the Midwest region arguably affected Plaintiff's business opportunities, especially considering that she exclusively covered the region before Cohen's arrival and Laub testified that the Midwest did not require two salespeople. But

---

[7] Defendants also argue that Plaintiff had been given several years to solicit business from those groups without success. (Defs.' Rule 56.1 Counterstatement ¶ 220.)

competition in her region does not rise to the level of a materially adverse change. Plaintiff was still free to solicit and market at will in the Midwest.[8]

In contrast, the change in Plaintiff's sales territory upon Laub's arrival, specifically, the decisions to limit it to the Midwest and deny Plaintiff's requests to expand her territory, strictly limited Plaintiff's opportunities to develop business. While Plaintiff had previously been free to market anywhere she chose, under Laub, Plaintiff was directed to focus on the Midwest.[9]   A reasonable juror could conclude that such a reduction materially deprived Plaintiff of valuable opportunities to expand her client base with prospects that previously were available for her solicitation. Similarly, Plaintiff's exclusion from client and networking events qualifies as a materially adverse change. Such events present an opportunity for salespeople to develop client relationships, meet new prospects, and expand their book of business. It is reasonable to infer that by not attending certain conferences, Plaintiff was disadvantaged in all of these areas. Finally, Plaintiff also challenges her allegedly unfair compensation, specifically her annual discretionary bonuses.[10]   Defendants' decision to compensate Plaintiff less than her peers represents an actual material loss that is emblematic of adverse employment action.

---

[8] Plaintiff testified that she was told that Cohen was to focus on larger hedge funds, while she would be expected to focus on smaller, emerging clients. (Defs.' Rule 56.1 Counterstatement ¶ 218.) However, Defendants maintain that this directive was not a mandate. (*Id.*) Moreover, at oral argument, Plaintiff conceded that she was still permitted to market to large hedge funds. (Tr. of Oral Argument, ECF No. 105, at 85–86.)

[9] In 2017, after this suit was filed, Plaintiff was also assigned a number of territories outside of the Midwest.

[10] Plaintiff does not challenge her salary, which has never been reduced. (*See* Tr. of Oral Argument at 31:12–18.) Other than annual discretionary bonuses, Jefferies also pays signing bonuses to certain employees in their year of hire. In arguing that she was paid less than her peers, Plaintiff attempts to compare her discretionary bonuses to both discretionary bonuses and signing bonuses received by other salespeople. (*See, e.g.,* Tr. of Oral Argument at 42–43.) However, such a comparison is inapposite as signing bonuses are not discretionary and not tied to annual performance. Plaintiff's claims of unfair compensation are appropriately limited to comparisons of her discretionary bonuses to those of other salespeople.

### 2. *Inference of Discriminatory Intent*

The Second Circuit has noted that an inference of discriminatory intent may be established by, *inter alia*, "more favorable treatment of employees not in the protected group." *Abdu-Brisson v. Delta Air Lines, Inc.,* 239 F.3d 456, 468 (2d Cir.2001) (quoting *Chambers v. TRM Copy Centers Corp.,* 43 F.3d 29, 37 (2d Cir. 1994)). A showing of disparate treatment is "a common and especially effective method of establishing the inference of discriminatory intent." *Id.*

Plaintiff does not raise any plausible inference of discriminatory intent, age- or gender-based, as to Defendants' decision to limit the geographical scope of her sales territory. There is no evidence that other colleagues were not similarly limited to a specific region upon Laub's arrival at Jefferies. Moreover, though Plaintiff claims that her later requests to expand her territory were denied while her male colleagues were awarded additional territory, she provides no support for her allegation. Conclusory and unsupported allegations are insufficient to satisfy Plaintiff's minimal burden at the prima facie stage. Plaintiff also cites Laub's decision to reassign portions of the territory of one of Plaintiff's colleagues to younger members of the sales team who would bring a "fresh perspective." (Defs.' Rule 56.1 Counterstatement ¶ 148.) This lone fact falls well short of establishing an inference of age discrimination.[11]

As to the remaining adverse actions at issue—exclusion from conferences and unfair compensation—the record does not support an inference of age discrimination. Plaintiff provides no evidence that her attendance at networking events was tied to age discrimination. Plaintiff was also paid less in discretionary bonuses than both older and younger colleagues in Prime Brokerage

---

[11] Plaintiff makes much of Laub's hiring and firing decisions that allegedly favored younger employees and his deposition testimony that he wanted to hire "strong juniors to develop into future leaders in prime brokerage." (Defs.' Rule 56.1 Counterstatement ¶ 144.) Plaintiff, however, was not fired. Moreover, Laub testified that he was focused on hiring both junior and senior people. (*Id.*)

Sales. Plaintiff, however, has adduced some evidence to support disparate treatment based on gender with respect to these adverse actions. Indeed, Plaintiff identified a specific conference in Florida that her male colleagues were permitted to attend, but that she was excluded from. And the record reflects that her male colleagues consistently received larger discretionary bonuses from 2014 to 2017.

### B. Legitimate, Non-Discriminatory Reasons

Once the plaintiff states a prima facie case of discrimination, the defendant must proffer a legitimate, non-discriminatory reason for its actions. At this stage, "[t]he defendant's burden also is light." *Greenway v. Buffalo Hilton Hotel*, 143 F.3d 47, 52 (2d Cir. 1998). The employer is required to "simply articulate an explanation that, if true, would connote lawful behavior." *Id.*

Defendants satisfy their burden. With respect to Plaintiff's exclusion from the Florida conference, Defendants contend that they had a limited number of passes to the event and Lakani decided which employees could attend based on their stated business reasons for attending. (Defs.' Rule 56.1 Counterstatement ¶ 168.) Plaintiff, Defendants allege, did not make any such presentation. (*Id.*)

As to Plaintiff's annual bonuses, Defendants argue that compensation decisions are discretionary and based on a series of quantitative and qualitative factors, including position, business results, departmental performance, overall performance, and geography. (Pl.'s Rule 56.1 Counterstatement ¶ 55.) They primarily justify Plaintiff's bonuses by arguing that she received average and below average performance reviews from three different managers during the years that are the subject of her complaint. An employee's deficient work performance is a legitimate, non-discriminatory reason for an adverse employment action. *See Dixon v. Int'l Fed'n of*

*Accountants*, 416 F. App'x 107, 110 (2d Cir. 2011) (citing *Slattery v. Swiss Reinsurance Am. Corp.*, 248 F.3d 87, 93 (2d Cir. 2001)).

### C. Pretext

Plaintiff, in response, has proffered sufficient evidence to at least raise a triable issue of fact as to whether Defendants' stated reasons are a pretext for gender discrimination. Plaintiff testified that two of her male colleagues informed her that, in contrast to Plaintiff, they were permitted to attend an important industry conference without first having to justify their presence. (Defs.' Rule 56.1 Counterstatement ¶ 169.) Though Defendants dispute this, the record before this Court does not indisputably demonstrate that Plaintiff's testimony is false.

Plaintiff also argues that Defendants' criticisms of her performance are undermined by objective measures. To be sure, "[t]he mere fact that an employee disagrees with her employer's assessments of her work . . . cannot standing on its own show that her employer's asserted reason . . . was pretextual." *Cappelli v. Jack Resnick & Sons, Inc.*, No. 13 Civ. 3481 (GHW), 2016 WL 958642, at *8 (S.D.N.Y. Mar. 8, 2016) (quoting *Ricks v. Conde Nast Publ'n, Inc.*, 92 F. Supp. 2d 338, 347 (S.D.N.Y. 2000), *aff'd*, 6 Fed. App'x. 74 (2d Cir. 2001)). Plaintiff, however, presents evidence of her good performance that raises a reasonable inference that her evaluations, at least for 2017, were suspect. Specifically, in 2017, Plaintiff quantitatively outperformed her peers who received greater discretionary bonuses. She generated the second highest revenue in the group, yet received the second worst discretionary bonus of those who were employed for the entire year and eligible for such a bonus.

Defendants dispute the weight of Plaintiff's evidence and argue that there are more factors that are relevant to such a determination than just revenue generated. That may be true, but, at this stage, Plaintiff has at least raised an issue of material fact about whether her performance reviews

were a pretext for gender discrimination.[12] The facts in dispute are dependent upon a determination

of the parties' credibility and that is inherently a question for the jury.

\* \* \*

Defendants' adverse employment actions do not support a claim for age discrimination.

Accordingly, summary judgment is granted dismissing Plaintiff's ADEA and Ohio Act age

discrimination claims.  However, because reasonable minds could differ as to whether Defendants

had non-pretextual business reasons for excluding Plaintiff from certain conferences and not

providing Plaintiff with discretionary bonuses comparable to her male peers, summary judgment

is inappropriate as to Plaintiff's claims for gender discrimination under Title VII[13] and the Ohio

Act.[14]

---

[12] Plaintiff also points to concerns about Laub raised by a colleague during her exit interview that Plaintiff characterizes as complaints of gender discrimination.  The employee in question primarily alleged that she was not taken seriously, that Laub belittled her and spoke to her in a demeaning manner.  (Defs.' Rule 56.1 Counterstatement ¶ 156.)  Defendants dispute whether the employee attributed Laub's actions to gender discrimination and deposition testimony from the employee does not resolve this issue.  In any event, this Court does not rely on this complaint in determining whether Defendants' stated reasons for their actions were pretextual.  Separately, Plaintiff alleges that Laub made a series of comments that evince a bias against women.  In particular, Laub allegedly commented that it is difficult for working mothers to handle the travel schedule that Plaintiff's position requires and, for some women, it is not as easy to participate in after hours entertaining because they have young kids.  (Defs.' Rule 56.1 Counterstatement ¶¶ 180–81.)  Defendants, again, dispute that Laub made such comments or that they were limited to women rather than all parents.  Nevertheless, such isolated, stray comments are not linked to any adverse action at issue and are not probative of discrimination.

[13] Plaintiff, however, is time barred from asserting a Title VII claim based on discrete acts occurring prior to June 13, 2017.  "A plaintiff may bring a claim under Title VII only for acts of discrimination that occurred within the statutory period set by 42 U.S.C. § 2000e–5(e)(1)."  *Patterson v. Cty. of Oneida, N.Y.*, 375 F.3d 206, 220 (2d Cir. 2004).  The parties do not dispute that the period applicable to this case is the 300-day period beginning June 13, 2017 and ending April 9, 2018, when Plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission (EEOC).  (Pl.'s Rule 56.1 Counterstatement ¶ 5.)  Plaintiff also offers no reason for this Court to equitably toll this deadline.  Of course, Plaintiff is still permitted to reference the time barred acts as "background evidence in support of a timely claim."  *Nat'l R.R. Passenger Corp. v. Morgan,* 536 U.S. 101, 113 (2002).  Additionally, Plaintiff's Ohio Act claims are not similarly limited.

[14] Defendant also argues that this Court should dismiss all of Plaintiff's Ohio Act claims, because such claims can only be brought against an "employer" and Jefferies does not qualify as such.  Under the Ohio Act, an "employer" is a "person employing four or more persons within the state, and any person acting

## IV.    PLAINTIFF'S RETALIATION CLAIMS ARE DISMISSED

Plaintiff also claims that Defendants retaliated against her after she raised her
discrimination claims. Retaliation claims are analyzed using the same *McDonnell Douglas* burden
shifting framework. *Chen*, 805 F.3d at 70. To meet her initial burden of establishing a prima facie
case of retaliation, Plaintiff must demonstrate: "(1) participation in a protected activity; (2) that the
defendant knew of the protected activity; (3) an adverse employment action; and (4) a causal
connection between the protected activity and the adverse employment action." *Hicks v. Baines*,
593 F.3d 159, 164 (2d Cir. 2010) (quoting *Jute v. Hamilton Sundstrand Corp.*, 420 F.3d 166, 173
(2d Cir. 2005)). "If the plaintiff sustains this initial burden, 'a presumption of retaliation arises.'"
*Id.* The defendant may rebut this presumption by providing a "legitimate, non-retaliatory reason
for the adverse employment action," *Chen*, 805 F.3d at 70 (quoting *Jute*, 420 F.3d at 173), at which
point the burden shifts back to the plaintiff to prove "that the desire to retaliate was the but-for
cause of the challenged employment action," *id.* (quoting *Univ. of Tex. Sw. Med. Ctr. v. Nassar*,
570 U.S. 338, 352 (2013)).

Here, Plaintiff has failed to demonstrate a prima facie case of retaliation. Plaintiff first
advised Defendants that she had retained counsel and intended to pursue claims for age and sex
discrimination in February 2017. (Pl.'s Rule 56.1 Counterstatement ¶ 1.) In April 2017, she filed

---

directly or indirectly in the interest of an employer." Ohio Rev. Code Ann. § 4112.01(A)(2). The parties
dispute whether Jefferies employs four or more persons within Ohio, as contemplated by the statute. (*See*
Pl.'s Rule 56.1 Counterstatement ¶ 20.) Defendants argue that Plaintiff has been the only employee in
Ohio since July 2014. Plaintiff, however, points to Laub's testimony that from 2014 to present, Jefferies
has had four or more employees servicing Ohio-based clients. These individuals "may be deemed
employees of [Jefferies] depending upon the nature and extent of the work they did in Ohio, if any."
*Spath v. Berry Plastics Corp.*, 900 F. Supp. 893, 901 (N.D. Ohio 1995). Defendants, however, have not
provided discovery regarding individuals who performed work within Ohio. Thus, the number of persons
employed by Jefferies in the state remains a genuine issue of material fact. It would be inappropriate to
issue summary judgment on Plaintiff's Ohio Act claims on the ground that Jefferies is not an employer
under the Ohio Act. *See id.*

the instant lawsuit in Ohio state court claiming that Jefferies and Laub had discriminated against her since the time of Laub's hiring. (*Id.* ¶¶ 2, 88.) Plaintiff claims that after engaging in this protected activity, Defendants took adverse employment action against her by underpaying her, permitting Cohen to solicit her clients, and unfairly assigning territory. However, because such conduct is effectively the same as that which allegedly preceded Plaintiff's protected activity, she cannot demonstrate a causal connection between the protected activity and the allegedly adverse employment action. "Where timing is the only basis for a claim of retaliation, and gradual adverse job actions began well before the plaintiff had ever engaged in any protected activity, an inference of retaliation does not arise."[15] *Slattery v. Swiss Reinsurance Am. Corp.*, 248 F.3d 87, 95 (2d Cir. 2001), *as amended* (June 6, 2001). "That Defendants allegedly continued" unfairly compensating Plaintiff and denying her business opportunities after she "filed a discrimination complaint cannot support an inference that the later-in-time actions were motivated by retaliatory intent." *Chung v. City Univ. of New York*, 605 F. App'x 20, 24 (2d Cir. 2015). Plaintiff's retaliation claims are dismissed.

## V.   PLAINTIFF'S OHIO PUBLIC POLICY CLAIM IS DISMISSED

Plaintiff also asserts a claim for wrongful discipline in violation of Ohio public policy as an alternative to her Ohio Act discrimination and retaliation claims. The parties dispute whether Plaintiff has adequately alleged such a claim under Ohio law. Defendants argue that the Ohio public policy doctrine primarily recognizes claims for wrongful discharge and only permits claims

---

[15] Plaintiff also argues that comments by a colleague evince a causal connection between the adverse actions and her protected conduct. Specifically, Plaintiff claims that her colleague advised that management was not going to address her concerns of discrimination and she needed to work to resolve her complaints directly with Cohen, otherwise it could be detrimental to Plaintiff or Cohen. (Defs.' Rule 56.1 Counterstatement ¶ 256.) Plaintiff's colleague, however, testified that she explained to Plaintiff that she was expressing her personal opinion, as opposed to that of management. (*Id.*) These isolated comments are insufficient to demonstrate that management was frustrated by Plaintiff's discrimination complaint and any adverse employment actions were motivated by retaliatory intent.

19

for wrongful discipline in very limited circumstances. Specifically, Defendants contend that claims for wrongful discipline are limited to demotions or failures to promote an employee, neither of which occurred here. Plaintiff disagrees. In any event, the existence of adequate statutory remedies requires dismissal of Plaintiff's common law tort claim. *See Mischer v. Erie Metro. Hous. Auth.*, 345 F. Supp. 2d 827, 832 (N.D. Ohio 2004), *aff'd sub nom. Mischer v. Erie Metro Hous. Auth.*, 168 F. App'x 709 (6th Cir. 2006). Indeed, courts have consistently found that an "Ohio public policy tort for employment discrimination, retaliation, or constructive discharge is unavailable due to the comprehensive remedies provided by Title VII." *Roller v. Brennan*, 2018 WL 4405834, at *7 (S.D. Ohio Sept. 17, 2018) (collecting cases). In the instant action, Plaintiff has sought relief under Title VII and ADEA for her discrimination claims, both of which offer adequate remedies. Accordingly, Plaintiff's common law public policy claim is dismissed.

## VI.    CONCLUSION

Defendants' motion for summary judgment, (ECF No. 90), is GRANTED to the extent that Plaintiff's Ohio public policy claim, Ohio Act age discrimination claims, ADEA claims, and retaliation claims are dismissed. The Clerk of Court is directed to close the motion accordingly.

Dated: New York, New York
November 19, 2020

SO ORDERED.

*George B. Daniels*

GEORGE B. DANIELS
United States District Judge

20